### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KEVIN THELEN,             )
                                   )

      Plaintiff,          )
                                   )

  vs.                    )
                                   )   CIVIL ACTION NO. 2:20-CV-1717

THE PENNSYLVANIA STATE SYSTEM )
OF HIGHER EDUCATION, INDIANA   )
UNIVERSITY OF PENNSYLVANIA,    )
MICHAEL DRISCOLL, SUSANNA SINK )
and DEBRA FITZSIMONS,          )
                                   )

      Defendants.       )

### MEMORANDUM OPINION

## I.   Introduction

On November 9, 2020, Plaintiff Kevin Thelen ("Thelen") commenced this employment discrimination action against The Pennsylvania State System of Higher Education ("PASSHE"); Indiana University of Pennsylvania ("IUP"); IUP President Michael Driscoll ("President Driscoll"); interim IUP Vice President of Administration and Finance Susanna Sink ("V.P. Sink"); and current IUP Vice President of Administration and Finance Debra Fitzsimons ("V.P. Fitzsimons") (collectively "Defendants").  (ECF Nos. 1; 10).

In his Amended Complaint, Thelen asserts the following claims: (1) First Amendment retaliation under 42 U.S.C. § 1983, against President Driscoll, V.P. Sink, and V.P. Fitzsimons; (2) discrimination under the Rehabilitation Act ("RA"), 29 U.S.C. § 794 *et seq.*, against PASSHE and IUP; (3) discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C.§ 12101 *et seq.*, against President Driscoll, V.P. Sink, and V.P. Fitzsimons; (4) retaliation for filing a workers' compensation claim in violation of Pennsylvania common law against President Driscoll, V.P. Sink, and V.P. Fitzsimons; (5) discrimination under the Age Discrimination in Employment

Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, against President Driscoll, V.P. Sink, and V.P. Fitzsimons; (6) discrimination on the basis of gender under Title VII, 42 U.S.C. § 2000e *et seq.*, against PASSHE and IUP; (7) hostile work environment under Title VII against PASSHE and IUP; (8) retaliation under Title VII against PASSHE and IUP; (9) discrimination on the basis of gender under Title IX, 20 U.S.C. § 1681 *et seq.*, against PASSHE and IUP; (10) hostile work environment under Title IX against PASSHE and IUP; and (11) retaliation under Title IX against PASSHE and IUP.  (ECF No. 10).

For the reasons that follow, Defendants' motion will be granted in part and denied in part.

## II.   Facts Alleged in Amended Complaint

Prior to Thelen accepting an appointment to become the Director of Public Safety and University Police at IUP, Vice President Cornelius Wooten assured him that he would have the school's full support to increase police accountability.  (ECF No. 10 ¶¶ 18, 26, 113).  On August 8, 2015, Thelen began his ten-month renewable appointment as the Director of Public Safety and University Police.  (*Id.* ¶¶ 18, 21).  His appointment letter states:

> Under the terms and conditions of Board of Governors Policy 1984-14-A: Terms and Conditions of Employment of Senior Policy Executives, you serve at the pleasure of the President and future extensions of this appointment will be determined by this office pursuant to the terms and conditions of Policy 1984-14-A.

(*Id.* ¶ 20).  Thelen received subsequent renewal letters from the V.P. of Administration and Finance.  (*Id.* ¶ 21).  Although Thelen's appointment letter was issued by IUP, his W-2 identifies PASSHE as his employer.  (*Id.* ¶ 22).

During his employment, Thelen uncovered a number of personnel and disciplinary problems at the university.  (*Id.* ¶ 27).  In 2015, after an officer seized evidence from a student's room (beer, drugs, and drug paraphernalia), the officer drank the beer in lieu of documenting its

seizure in a police report.  (*Id.* ¶¶ 27-28).  Following an internal review, Thelen recommended that the officer be terminated.  (*Id.* ¶ 28).  An unidentified decisionmaker at IUP disagreed and reassigned the officer to the Facilities Department to work as a laborer.  (*Id.* ¶ 29).

Similarly, when a female officer was sexually harassed during her new hire training, Thelen reported it to Associate Vice President for Human Resources Craig Bickley ("Bickley").  (*Id.* ¶¶ 30, 49).  Bickley responded by asking Pablo Mendoza to investigate.  (*Id.*)  After Thelen complained to Bickley that this investigation had been poorly done, Bickley reassigned the Title IX complaint to an outside investigator.  (*Id.*)  Thelen again told Bickley that the investigation was deficient.  (*Id.*)  Ultimately, the alleged harasser negotiated an agreement whereby he resigned his employment in exchange for his daughter to continue her tuition-free studies at IUP.  (*Id.* ¶ 30).  Thelen's complaints that the investigation was faulty, which were made on behalf of the female officer, were outside the scope of his duties.  (*Id.* ¶ 29).

Thelen also discovered that an officer was altering the trigger pulls on several Department-issued handguns.  (*Id.* ¶ 31).  As part of the ensuing investigation, Thelen identified at least one other officer who was doing the same thing.  (*Id.* ¶ 32).  Officer Chris Rearick was disciplined as a result.  (*Id.*)  Thelen represents that this investigation was also outside the scope of his duties.  (*Id.* ¶ 34).

Subsequently, Thelen decided that an unnamed outside security team would no longer be permitted to work campus events because it had failed to comply with its contract with IUP during a prom held on campus.  (*Id.* ¶¶ 34-40).  Anthony Clement ("Clement"), V.P. Sink's brother, was part of this security team.  (*Id.* ¶ 36).  Thelen believes that Clement notified V.P. Sink of his decision.  (*Id.* ¶ 40).

Thereafter, in September 2018, Rebecca Clement, V.P. Sink's niece, applied for a promotion in Thelen's department as a Public Safety Administrative Assistant. (*Id.* ¶ 41). Caroline Speer ("Speer"), who was already working in Thelen's department, was promoted to this position, however. (*Id.* ¶¶ 42-43). Because Thelen hired someone other than V.P. Sink's niece, V.P. Sink and several others including Megan Heilbrun ("Heilburn"), began spreading rumors that Speer was having an affair with Thelen. (*Id.* ¶¶ 44-45). Thelen learned of these rumors from Speer. (*Id.* ¶ 46). V.P. Sink's niece was later promoted to a position in a different department. (*Id.* ¶ 47).

Seven months later, the PASSHE Officers Association Union ("Union"), of which Officer Rearick was the President, filed two grievances against Thelen. (*Id.* ¶ 48). The first was in response to Thelen's directive to a supervisor to issue an Incident of Note for Officers Rearick and Porada, who as firing range instructors, allowed a female officer three attempts to qualify when Department policy only permitted two. (*Id.* ¶ 51). The second grievance was in response to Thelen's orders restricting officers' use of Department equipment while employed in an outside capacity and prohibiting officers from working outside employment within eight hours of an assigned shift or other duty assignment. (*Id.* ¶ 53).

Bickley denied the first grievance. (*Id.* ¶ 56). He partially sustained the second, ruling that whether an officer should be permitted to work outside employment within eight hours of a shift at IUP was a condition of employment and thus, subject to negotiation. (*Id.*) Although Thelen later asked Bickley to identify the provision in the collective bargaining agreement that addressed secondary employment conditions, he never received a response. (*Id.* ¶ 57).

On October 17, 2019, a no confidence letter signed by the Union president was issued against Thelen. (*Id.* ¶¶ 59-63). Eleven days later, V.P. Sink handed Thelen a copy of the letter but told Thelen "don't worry about it." (*Id.* ¶ 63). The letter reads in part:

4

> We believe that the lack of leadership, clear progressive direction, lack of understanding of the Pennsylvania rules of criminal procedures, lack of understanding of local judicial practices and rules pose a significant risk to the safety and security off[sic] all members of the [IUP] community and property. It is also the shared belief of the POA members, that the high turnover rate of employees at the Indiana University . . . Police Department is a direct result of a hostile work environment created by the current leadership of the department. During the tenure of the current leadership starting in 2015[, IUP] Police has lost twenty-two Police Officers and/or other departmental employees. We believe that the safety of all members of [the IUP] community are at risk. We propose to take this extraordinary step and have voted "No Confidence" in the leadership of this Police Department.

(*Id.* ¶ 59). Thelen denies these allegations. (*Id.* ¶ 60).

Almost a month later, V.P. Sink's Executive Assistant emailed Thelen and advised him that V.P. Sink no longer needed him to serve as the emcee at her retirement party. (*Id.* ¶ 69). Director of the IUP Police Academy Dennis Marsili told Thelen several days later that "I hear we're getting another search committee ready for your position." (*Id.* ¶ 70). Director Marsili apologized to Thelen the next day, explaining that he had confused Thelen's position with another. (*Id.* ¶ 74).

In early December 2019, V.P. Sink informed Thelen that the Union had expressed additional concerns. (*Id.* ¶ 75). Its members were upset that (1) Thelen had eliminated the "no questions asked" leave policy without discussing it with his officers, (2) one of the Department's vehicles did not have a license plate, and (3) he brought his dog to work. (*Id.*). The Union also sought clarification concerning Thelen's use of Department investigators. (*Id.*)

In mid-December, V.P. Sink retired and was replaced by V.P. Fitzsimons. (*Id.* ¶ 77).

On December 27, 2019, Officer Noah Miller called off using a "no questions asked" personal day. (*Id.* ¶ 78). Because it would leave the Department short-staffed and the policy no longer existed, Thelen declined Officer Miller's request. (*Id.*) Officer Miller responded by notifying Thelen that he was sick, and Thelen advised him that he would need to provide a

5

confirming note from his doctor when he returned to work.  (*Id.* ¶ 80).  Officer Miller subsequently submitted the following documents: (1) a "medical excuse" from the Indiana Regional Medical Center for an Urgent Care visit and a prescription for Azithromycin signed by his sister-in-law; (2) a script sheet from Rite Aid Pharmacy signed by his wife; and (3) a Request for Leave slip that both he and his supervisor, Officer Rearick, had signed.  (*Id.* ¶ 81).

Upon his review, Thelen noticed that the prescription paperwork had the exact same handwriting as the medical excuse.  (*Id.*)  Believing the documents to be falsified, Thelen advised Bickley that he had decided to investigate.  (*Id.* ¶¶ 82-87).  Bickley asked Thelen to provide him with the background and permitted Thelen to lead the investigation despite the "no confidence" letter issued by the Union.  (*Id.* ¶ 87).  Thelen alleges that this investigation was beyond the scope of his duties.  (*Id.*)

On January 13, 2020, Bickley advised Officer Miller that a pre-disciplinary meeting was scheduled for later that week.  (*Id.* ¶ 88).  The meeting was ultimately postponed because V.P. Fitzsimons wanted to discuss her concerns about the investigation with Thelen and Bickley.  (*Id.*)

Two days later, Thelen tripped over a piece of exposed metal at IUP's gas tanks, which caused him to fall and injure his shoulder.  (*Id.* ¶ 89).  Thelen submitted an injury report to Human Resources.  (*Id.* ¶ 91).  He also reported his injury to the Public Safety Department representative to the IUP Safety Committee, Heilbrun.  (*Id.*)  Additionally, his workplace injury was investigated by an Environmental Health and Safety Officer who reports to V.P. Fitzsimons.  (*Id.*)[1]

---

[1] Following his termination, Thelen had surgery to repair the torn labrum in his left shoulder.  (*Id.* ¶ 89).  He continues to have issues with mobility and strength, has weight-lifting restrictions, and is still receiving treatment.  (*Id.* ¶ 90).

The following week, V.P. Fitzsimons met with Thelen and Bickley to discuss his investigation of Officer Miller.  (*Id.* ¶ 93).  She informed Thelen that V.P. Sink had told her that there were concerns within the Police Department that Thelen was treating employees unequally and officers were afraid of approaching him with any issues.  (*Id.* ¶ 94).  Thelen responded that without being given specific complaints, "he found it to be facially irresponsible to bring [this] up as a topic of conversation" (*Id.* ¶ 95), and doubted that any officers actually feared him, (*Id.* ¶ 97).  Rather, they did not appreciate being held accountable for their misbehavior.  (*Id.*)

Officer Miller's pre-disciplinary hearing was held on February 4, 2020.  (*Id.* ¶ 102).  Immediately thereafter, Thelen and Bickley met with V.P. Fitzsimons and told her that Officer Miller seemed reluctant to accept responsibility for his actions.  (*Id.* ¶ 103).  V.P. Fitzsimons asked Bickley to complete the investigation and make a recommendation as to whether discipline was warranted.  (*Id.*)  Thelen interjected that there were numerous criminal violations that had been committed and that he would be sending a Brady letter to the district attorney's office to fulfill IUP's legal obligations.  (*Id.* ¶¶ 105-06).  Thelen left V.P. Fitzsimons' office that day with the understanding that Bickley would complete the investigation.  (*Id.* ¶ 106).

The next day, Thelen was handed a termination letter signed by President Driscoll when he met with V.P. Fitzsimons and Bickley.  (*Id.* ¶¶ 110-11).  The letter reads, in part, as follows:

> [t]he purpose of this letter is to convey to you that senior leadership and I have lost confidence in your ability to effectively perform your assigned duties as a Director of Public Safety and University Police.  Your employment with [IUP] is terminated effective immediately, as of February 5, 2020.

(*Id.* ¶ 113).  He was fifty-nine years old when he was terminated.  (*Id.* ¶ 16).

Thelen was briefly replaced by Lieutenant Melvin Cornell.  (*Id.* ¶ 116).  Two weeks later, V.P. Fitzsimons named former V.P. Sink's brother, Clement, as interim director.  (*Id.*)  Clement is sufficiently younger than Thelen and less experienced.  (*Id.* ¶ 118).  Clement's hiring was timed

to coincide with his retirement from the Indiana Borough Police Department on February 14, 2020.[2]  (*Id.* ¶ 121).  V.P. Fitzsimons later cancelled and closed the investigation of Officer Miller after a "counseling session" in her office.  (*Id.* ¶ 108).

Thelen's last performance evaluation was conducted by V.P. Sink and confirmed by President Driscoll in July 2019.  (*Id.* ¶ 24).  Thelen received the scores of "Significantly and Consistently Exceeds Expectations" and "Exceeds Expectations" in all 8 categories, including "Communication, Collaboration and Interpersonal Skills," "Policy and Decision Making," "Leadership," and "Planning and Program/Project Management."  (*Id.*)

## III.    Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The Supreme Court held, pertaining to Rule 12(b)(6)'s standard of review, that a complaint must include factual allegations that "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests."  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008).

In determining whether a plaintiff has met this standard, a court must reject legal conclusions unsupported by factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements"; "labels and conclusions"; and "'naked

---

[2] V.P. Sink previously had tried to convince Thelen to hire another brother for a part-time position. (*Id.* ¶¶ 122-24).

assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (citations omitted).

Mere "possibilities" of misconduct are insufficient.  *Id.* at 679.

> The Court of Appeals has summarized this inquiry as follows:
>
> To determine the sufficiency of a complaint, a court must take three steps.  First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1947, 173 L.Ed.2d 868 (2009). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 1950.  Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  *Id.*  This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

*Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

## IV.   Discussion and Analysis

1.   <u>Count I: Section 1983 First Amendment Retaliation against President Driscoll, V.P. Sink, and V.P. Fitzsimons</u>

Thelen alleges in Count I of the Amended Complaint that the conduct of President Driscoll, V.P. Sink and V.P. Fitzsimons was in retaliation for the exercise of his First Amendment rights. Defendants move to dismiss this claim, arguing that Thelen has failed to state a claim for First Amendment retaliation because he was neither speaking as a citizen nor about matters of public concern when making his purportedly protected statements.  (ECF No. 13 at 4-6).  Defendants further assert that "[e]ven if any of [p]laintiff's proffered activities were cognizable as protected, he has wholly failed to show any connection between said activities and any adverse action beyond conclusory statements."  (*Id.* at 6).

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. Amend. 1. "First Amendment freedoms are protected by the Fourteenth

Amendment from invasion by the States."[3]  *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 907 n.43 (1982).   "The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see also id.* at 420 ("Underlying our [precedent] has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance") (internal citation and quotation omitted).

To state a First Amendment retaliation claim based on a violation of the right to free speech, a plaintiff must plead that: "(1) he engaged in 'constitutionally protected' conduct; (2) the defendant engaged in 'retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights,' and (3) 'a causal link [existed] between the constitutionally protected conduct and the retaliatory action.'"  *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Palardy v. Twp. of Millburn*, 906 F.3d 76, 80-81 (3d Cir. 2018)).

Where a person invoking his First Amendment rights is also a public employee, the plaintiff must further plead that the employee spoke as a citizen, his statement involved a matter of public concern, and "the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public.'"  *Starnes v. Butler Cty. Court of Common Pleas*, 971 F.3d 416, 429 (3d Cir. 2020) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006)).

---

[3] Defendants also move to dismiss Plaintiff's Fourteenth Amendment claim.  (ECF No. 13 at 4, 6-7).  Thelen responds that he has not pled a separate cause of action and is using the Fourteenth Amendment merely as a vehicle through which he can assert his First Amendment claim.  (ECF 20 at 6 n.2).  The First Amendment Free Speech and Petition Clauses apply to state actors because of their incorporation within the Due Process Clause of the Fourteenth Amendment.  *Meyer v. Grant*, 486 U.S. 414, 420 (1988).   Thus, Defendants' argument vis-à-vis the Fourteenth Amendment claim is without merit.

Concerning the first element of a First Amendment retaliation claim, the Supreme Court held in *Garcetti v. Ceballos* that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. Subsequently, the Court clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). The Court explained that the term "official responsibilities," means the responsibilities an employee undertook when he "went to work and performed the tasks he was paid to perform." *Id.* at 239.

As noted by the Third Circuit in *Flora v. Cty. of Luzerne*, 776 F.3d 169 (3d Cir. 2015):

> Whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law. . . . Specifically, the scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law.

776 F.3d at 175 (internal citation and quotation omitted). Further:

> In conducting this inquiry, courts in this Circuit consider the "audience of [the] employee's speech," *Barnes v. Brown*, Civil A. No. 16-214, 2016 WL 5376023, at *8 (E.D. Pa. Sept. 26, 2016) (citation omitted); whether "the mode and manner of [the employee's] speech were possible only as an ordinary corollary as to his position as a government employee," *De Ritis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017); whether the speech was "part of the work [the plaintiff] was paid to perform on an ordinary basis," *id.*; "whether there is a 'relevant analogue to [the] speech by citizens who are not government employees,'" *Morris*, 487 F. App'x at 40 (citation omitted); and whether the speech was "derived from special knowledge or experience acquired on the job," *McAndrew v. Bucks Cnty. Bd. of Comm'rs*, 982 F. Supp. 2d 491, 498 (E.D. Pa. 2013) (quotation marks and citations omitted)). Overall, "the line between citizen speech and employee speech varies with each case's circumstances," and the Third Circuit has cautioned lower courts that they cannot rely on "simple tests" to differentiate between the two. *De Ritis*, 861 F.3d at 454.

*See Brown v. City of Phila.*, __ F. Supp. 3d __, 2021 WL 2186243, at *19 (E.D. Pa. May 27, 2021).

11

As to the second element of a retaliation claim under the First Amendment, "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, . . . or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations omitted). While "in one sense the public may always be interested in how government officers are performing their duties," that does not transform an employee's issue with his supervisors into a matter of public concern. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 399 (2011).

In their motion, Defendants do not challenge whether Thelen has properly pled the third element, i.e., that the government employer did not have an adequate justification for treating the employee differently from any other member of the general public. Instead, Defendants challenge the fourth element, that is, whether Thelen has pleaded a plausible causal link. To state a causal link, the plaintiff must allege either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

With these principles in mind, the Court turns to the allegations in Plaintiff's Amended Complaint and concludes that Thelen has alleged facts that plausibly could support a claim for First Amendment retaliation. Indeed, the facts of this case are analogous to *Javitz v. County of Luzerne*, 940 F.3d 858 (3d Cir. 2019), in which our Court of Appeals held that a human resource director had stated a plausible First Amendment retaliation claim when she went with her supervisor to the district attorney's office to report that a coworker was unlawfully recording work meetings without her consent and was then terminated a few months later. Similarly, Thelen notified V.P. Fitzsimons that an officer had provided a forged prescription and medical excuse and

that he would be sending the district attorney a Brady letter.  (ECF No. 10 ¶ 106).  He further pleads that while he sent this letter, it was the University's responsibility, not his, to report crimes. (*Id.* ¶¶ 106, 144).  *See Javitz*, 940 F.3d at 866 ("the fact that [plaintiff] could easily contact the [d]istrict [a]ttorney by virtue of her employment does not support a finding that Javitz spoke as an employee and not a citizen").

In addition, because Thelen was bringing to light a possible crime by sending the letter, he was speaking about a matter of public concern.  *See id.*  Finally, Thelen has adequately pleaded causation as he was terminated the next day by President Driscoll.  (ECF No. 10 ¶¶ 102-15).

For these reasons, Defendants' motion to dismiss Count I is denied.

2.    Count II: Discrimination Rehabilitation Act Claim against PASSHE and IUP

Thelen alleges in Count II that he was disabled for purposes of the RA.  Further, he pleads that he was treated less favorably and was terminated on account of his disability and/or his perceived disability in violation of the RA.  Defendants move to dismiss Count II,  asserting that "[n]o allegations are pled regarding in what way or by whom Plaintiff was perceived as disabled" or that his termination was caused by his disability.  (ECF No. 13 at 7).

To state a claim under the RA a plaintiff "must allege that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288-89 (3d Cir. 2019).  To be "regarded as" disabled within the meaning of 42 U.S.C. § 12102(2)(C), an individual must establish that he or she was "subjected to an action prohibited under [the ADA or RA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Holyk v. Scranton*

13

*Counseling Ctr.*, 2018 WL 585611, at *4 (M.D. Pa. Jan. 29, 2018) (citing 42 U.S.C. § 12102(3)(A)).

The statute's definition of "disability" includes instances when an individual is "regarded as having" "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1); *see L.B. v. Radnor Twp. Sch. Dist.*, 2021 WL 1224077, at *6 (E.D. Pa. Apr. 1, 2021). "An employer's mere awareness of an impairment, however, is insufficient to establish that it regarded the employee as disabled." *Brearey v. Brennan*, 2019 WL 111037, at *7 (E.D. Pa. Jan. 4, 2019) (quoting *Showers v. Endoscopy Ctr. of Cent. Pa., LLC*, 58 F. Supp. 3d 446, 462 (M.D. Pa. 2014)). This is because "[i]t is the employer's perception which matters, and not the employee's actual limitations." *Brearey*, 2019 WL 111037, at *7 (quoting *Vierra v. Wayne Mem'l Hosp.*, 168 Fed. App'x 492, 496 (3d Cir. 2006)). Moreover, where an employer understood a plaintiff's injury as being transitory and minor a plaintiff cannot be understood as being perceived as disabled. *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) (citing 29 C.F.R. § 1630.15(f)) (finding that a broken finger "is objectively transitory and minor").

Defendants argue that the claim of perceived disability should be dismissed, and the Court agrees. Thelen has not alleged any facts that support this claim. The fact that Defendants were aware that Plaintiff sustained an injury is not sufficient alone to state a claim. *See Brearery*, 2019 WL 111037, at *7. There are no allegations, or even an implication, in the Amended Complaint that anyone knew of Thelen's pain or loss of joint stability, that his injury impacted his ability to do is job in any way or that anyone believed his injury was anything more than "transitory and minor." The fact that after his termination, he had surgery, had to wear a sling post-surgery, and

14

continues to have lingering post-surgical issues is not relevant to what Defendants perceived at the time he was terminated.

Accordingly, as Plaintiff has not pled a plausible claim that Thelen was perceived as disabled, Count II is dismissed without prejudice so that Thelen may attempt to cure these deficiencies if he chooses to do so.[4]

3.   Count III: ADA Discrimination Claim against President Driscoll, V.P. Sink, and V.P. Fitzsimons

Defendants also seek dismissal of Thelen's ADA claim based on Eleventh Amendment immunity. (ECF No. 13 at 8 n.2). In his responsive brief, Thelen clarifies that he is pursuing his claim under Title I. (ECF No. 20 at 22). He also appears to concede that prospective relief is the sole remedy for his claim. (*Id.* at 20-21). Thelen is correct, as the Eleventh Amendment does not bar claims for prospective injunctive relief against individual defendants. *See Koslow v. Commw. of Pa.*, 302 F.3d 161, 178 (3d Cir. 2002) (explaining there is no individual liability for damages under Title I of the ADA, "prospective relief against state officials acting in their official capacities may proceed under the statute"). Conversely, it is well-established that "[w]hen the relief sought is prospective injunctive relief, the request 'is ordinarily sufficient to invoke' the [doctrine *of Ex parte Young*]. . . ." *Woolslayer v. Driscoll*, 2020 WL 5983078, at *5 (W.D. Pa. Oct. 8, 2020) (quoting *Koslow v. Commw. of Pa.*, 302 F.3d 161, 179, at *5 (3d Cir. 2002)). "[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation

---

[4] In response to the motion to dismiss, Thelen represents his intention is to state both an actual and perceived disability claim. (ECF No. 20 at 13). To the extent that he intends to pursue a claim for actual disability, the Court will permit one final opportunity to amend.

of federal law and seeks relief properly characterized as prospective." *Id.* (quoting *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011)).

A review of the Amended Complaint demonstrates that Thelen seeks reinstatement as well as other prospective relief and has alleged that the harm is ongoing.  (ECF No. 10 ¶¶ 176, 187-224).  *Contra Demarco v. Dep't of Corr.*, 1999 WL 997751, at *3 (E.D. Pa. Nov. 2, 1999) ("[p]laintiff's complaint never alleges that there are ongoing practices at the Department of Corrections that violate federal law, nor does [p]laintiff ever allege that he is currently suffering as a result of ongoing violations of federal law").  Consequently, because amendment would be futile, Count III is dismissed with prejudice except to the extent that Thelen seeks prospective injunctive relief from Defendants in their official capacities.[5]

    4.   <u>Count IV: Pennsylvania Common Law Claim of Workers' Compensation Retaliation against President Driscoll, V.P. Sink, and V.P. Fitzsimons</u>

Defendants argue that the doctrine of sovereign immunity precludes Plaintiff's workers' compensation retaliation claim.  (ECF No. 13 at 9).  Although Pennsylvania recognizes a "common law action for wrongful termination in Pennsylvania, the claim recognized is not an exception to, or otherwise exempt from, the Tort Claims Act."  *Cucchi v. Kagel*, 2018 WL 1141255, at *6-*7 (E.D. Pa. Mar. 2, 2018) (citing *Haiden v. Greene Cty. Career & Tech. Ctr.*, 2009 WL 2341922, at *3 (W.D. Pa. July 27, 2009)).  Thus, Commonwealth employees acting within the scope of their duties are entitled to sovereign immunity.  *See* 1 Pa. Stat. and Con. Stat. Ann. § 2310 ("[I]t is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity

---

[5] The standard for disability under Title I and the RA is identical.  *See Nesby v. Yellen*, 2021 WL 1340000, at *8 (W.D. Pa. Apr. 9, 2021).  Thus, any perceived as disabled claim deficient under the RA would likewise be deficient under the ADA.

and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity").

"While the question of whether an individual has acted within the scope of his employment is typically a question of fact for a jury, the issue can be decided as a matter of law where the facts and inferences drawn from the complaint are not in dispute." *Perano v. Arbaugh*, 2011 WL 1103885, at *21 (E.D. Pa. Mar. 25, 2011) (citing *Strothers v. Nassan*, 2009 WL 976604 (W.D. Pa. Apr. 9, 2009). "[A]n action falls within the scope of employment if: (1) it is the kind that the employee is employed to perform; (2) it occurs substantially within the job's authorized time and space limits, and; (3) it is motivated at least in part by a desire to serve the employer." *Flagg v. Int'l Union, Sec., Police, Fire Prof. of Am., Local 506*, 146 A.3d 300, 309 (Pa. Commw. Ct. 2016) (*Mitchell v. Lukenbill*, 680 F. Supp. 2d. 672, 682 (M.D. Pa. 2010)) (internal citation omitted). Notably, courts have been resolute that even a defendant's "willful misconduct does not vitiate a Commonwealth employee's immunity if the employee [was] acting within the scope of his employment. . . ." *Mitchell*, 680 F. Supp. 2d at 682 (quoting *Cooper v. Beard*, 2006 WL 3208783, at *16 (E.D. Pa. Nov. 2, 2006)). *See Davis v. Pa. Turnpike Comm'n*, 204 F. Supp. 3d 793, 802 (M.D. Pa. 2016) (finding even if [the defendants'] actions were illegal or intentionally tortious, they formed part of the activities of the [Pennsylvania Turnpike] Commission" and as a result, the defendants were "entitled to immunity on [the p]laintiff's wrongful discharge common law claim and her civil conspiracy claim"); *Povish v. Pa. Dep't of Corr.*, 2014 WL 1281226, at *10 (E.D. Pa. Mar. 28, 2014) (explaining that because it was clear from the complaint that the plaintiff's "job as personnel officer included handling [the p]laintiff's unemployment proceedings and disciplinary hearing," "even misstatements or outright lies in the course of doing so [were still within the] scope of [defendant's] employment").

17

Here, Thelen has failed to plead any facts to show that Defendants were acting outside the scope of their employment in terminating him.  This not surprising because hiring and firing are patently within the scope of a supervisor's duties.  *Obotetukudo v. Clarion Univ.*, 2014 WL 3870003, at *12 (W.D. Pa. Aug. 6, 2014) (holding "[t]he decision to terminate an employee and the evaluative process supporting that decision are clearly within the scope of the individual defendants' responsibilities as administrators of Clarion University"); *Scrip v. Seneca*, 191 A.3d 917, 932 (Pa. Commw. Ct. 2018) (finding that because the plaintiff was within the individual defendants' chain of command, the defendants were clearly acting within the scope of their employment when they made the decision to discipline and to ultimately terminate the plaintiff irrespective of their motives).  *See* (ECF No. 10 ¶ 111).

In an attempt to avoid these problematic facts, Thelen appears to argue that because he was fired prior to being given any warning, his termination must not have been lawful and the Eleventh Amendment cannot apply.  (ECF No. 20 at 18).  He has cited no case law to support this proposition, and the Court was unable to locate any.[6]  For these reasons, amendment of Count IV would be futile, and therefore, it is dismissed with prejudice.

5.    Count V: ADEA Discrimination Claim against President Driscoll, V.P. Sink, and V.P. Fitzsimons

Defendants further seek dismissal of Count V arguing that the Eleventh Amendment bars this claim.  (ECF No. 13 at 10-11).  For the reasons already stated in Section III(3), to the extent Thelen is seeking prospective relief against President Driscoll, V.P. Sink, and V.P. Fitzsimons, his

---

[6] It is unclear whether Thelen is referring to some right bestowed to him under a union grievance system.  Regardless, "Pennsylvania courts consistently have held, however, that those common law wrongful discharge suits cannot be brought by union employees subject to a CBA."  *See Bashore v. Pocono Mountain Reg'l Police Comm'n*, 2020 WL 1330649, at *11 (M.D. Pa. Mar. 23, 2020).

claim is not barred.  *See Simmons v. IUP*, 2018 WL 1141736, at *4 (W.D. Pa. Mar. 2, 2018) (analyzing the applicability of the Eleventh Amendment in an AEDA claim).  Thus, Count V is dismissed with prejudice except to the extent that he seeks prospective injunctive relief from Defendants in their official capacities.

> 6.   <u>Counts VI and IX: Titles VII and IX Discrimination on the Basis of Gender Claims (Disparate Treatment) against PASSHE and IUP</u>

Thelen asserts that in violation of Title VII and Title IX, he was discriminated against by PASSHE and IUP based upon his gender.  Defendants move to dismiss these claims, arguing that Thelen failed to plead any facts to suggest "that his termination was connected to his gender." (ECF No. 13 at 12-13, 16-17).

To succeed on a gender discrimination claim under either Title VII or Title IX, plaintiff must plead: (1) the plaintiff belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) "the action occurred under circumstances that could give rise to an inference of intentional discrimination."  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)); *A.H. v. Minersville Area Sch. Dist.*, 408 F. Supp. 3d 536, 572 (M.D. Pa. 2019) (Title IX case); *Baugh v. Robert Morris Univ.*, 2018 WL 1400063, at *13 (W.D. Pa. Mar. 20, 2018) (Title IX case).

At issue here is the fourth element.

> To establish the fourth element, a plaintiff may either: (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action.

*Greene v. Virgin Islands Water & Power Auth.*, 557 Fed. App'x 189, 195 (3d Cir. 2014).

Thelen has not pleaded facts to support an inference of intentional discrimination.  Rather, he appears to argue that because *the rumor* about his affair was sexual in nature, he was discriminated against on the basis of his gender.  (ECF No. 20 at 24).  Thelen has cited no case law to support this contention and the Court's independent research failed to identify any.  Moreover, the case law is clear a claim does not fall within the confines of the statutes simply because a plaintiff has been accused of violating them.  *See Winter v. Pa. State Univ.*, 172 F. Supp. 3d 756, 775 (M.D. Pa. 2016) (finding "no facts alleged in the [c]omplaint to support a plausible inference that any of the [d]efendants' recommendations or Defendant Barron's decision to ultimately terminate [the p]laintiff was based on his gender" despite the plaintiff having been subjected to a sexual harassment investigation).  Thelen also has failed to plead any evidence of comparators as he merely hypothesizes that a female rumored to be engaging in a fabricated quid pro quo relationship with a subordinate would not have been terminated.

For these reasons, Thelen has failed to plead facts sufficient to support his contention that there was any disparate treatment or that the conduct occurred under circumstances that could give rise to an inference of intentional discrimination.  Thus, he has not stated a plausible gender discrimination claim under either Title VII or IX.  Therefore, Counts VI and IX are dismissed with prejudice given that amendment would be futile.

7.   Counts VII and X: Titles VII and IX Hostile Work Environment Claims against PASSHE and IUP

Defendants likewise move to dismiss Counts VII and X, in which Thelen asserts hostile work environment claims under Titles VII and IX.  Defendants contend that Thelen was not discriminated against because of his gender, the alleged instances do not rise to the requisite level

of severity to state a plausible claim, there was no adverse action, and there is no indication that Plaintiff's gender was a motivating factor.  (ECF No. 13 at 13-15, 18).

To state a hostile work environment claim, a plaintiff must allege that (1) he suffered intentional discrimination because of his gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for respondeat superior liability is present. *Starnes v. Butler Cty. Court of Common Pleas*, 971 F.3d 416, 428 (3d Cir. 2020) (Title VII); *Kahan v. Slippery Rock Univ. of Pa.*, 664 Fed. App'x 170, 173 (Nov. 8, 2016) (Title IX).  "The Supreme Court has 'made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment,' and that '[t]he standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code."  *Donahue-Cavlovic v. Borough of Baldwin*, 2017 WL 4862072, at *7 (W.D. Oct. 26, 2017) (quoting *Obergantschnig v. Saw Creek Estates Comm. Ass'n, Inc.*, 2013 WL 5676328, at *7 (E.D. Pa. Oct. 18, 2013)).  "In evaluating these claims, the court must consider the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether it was threatening or humiliating, and whether it unreasonably interfered with the employee's performance."  *O'Brien v. Middle East Forum*, 2021 WL 2186434, at *4 (E.D. Pa. May 28, 2021) (quoting *Mandel*, 706 F.3d at 168).

Thelen has failed to meet the first element that he was discriminated against because of his sex. While a rumor can form the basis of a hostile work environment claim, rumors do not automatically bring a claim within the confines of either Title VII or Title IX.  *Treaster v. Conestoga Wood Specialties, Corp.*, 2010 WL 2606479, at *14 (M.D. Pa. Apr. 29, 2010).  In *Spain v. Gallegos,* one of the cases on which Thelen relies, the Third Circuit provided two such examples of where rumors would not result in a violation, i.e., where the "rumors concern the behavior of a

co-worker outside of the workplace, or [were] developed as the result of other employees' misperception of a supervisor's and an employee's frequent but necessary, job-related interaction." 26 F.3d 439, 449 (3d Cir. 1994).

Here, Thelen alleges that V.P. Sink began this rumor after Thelen declined to hire her niece. He expressly pleaded nepotism was the genesis of the rumor.  (ECF No. 10 ¶¶ 253-55).  Further emphasizing this fact, he also pleaded that he previously "promoted a female employee (unrelated to [V.P.] Sink) to Lieutenant following a Human Resources-approved testing process and there were no similar suggestions of a quid-pro-quo arrangement from the Department membership." (*Id.*¶ 260).  Hence, the facts of this case are more closely analogous to *Kahan v. Slippery Rock University of Pittsburgh* than *Spain v. Gallegos* in that Thelen's gender is not actually relevant to his claim.[7]  In *Kahan*, the Court of Appeals wrote

> According to Kahan, Winslow's accusations that he sexually harassed her son in class subjected him to a hostile work environment because the accusations were false and detrimentally affected him.  But even if Kahan is correct that Winslow falsely accused him of harassing her son, he offers no evidence that Winslow's allegations were made because of Kahan's gender.  Instead, Winslow's complaints about Kahan's teaching appeared to stem from his refusal to give her son an extension on a final report in Kahan's class.

664 Fed. App'x at 174.

---

[7] It should be noted that in *Spain*, the plaintiff alleged a false rumor of her having a sexual relationship was exploited by her supervisor.  26 F.3d 439.  In passing, the Third Circuit mentioned that "while it is true that the rumors also implicated Nelson, the rumors did not suggest that his involvement in the alleged relationship had brought him additional power in the workplace over his fellow employees, and the employees had no reason for resenting him in the way they did Spain.  Accordingly, he did not have to endure a hostile working environment brought about due to his sex." *Id.* at 448.  As already stated, Thelen has not pointed to any case law to suggest that being falsely accused of being a Title VII and Title IX violator (even if fabricated) brings a claim within the confines of either statute.

This Court similarly finds Thelen has not pled a plausible claim under either Title VII or Title IX and amendment would be futile.  As such, Counts VII and X will be dismissed with prejudice.

        8.    <u>Counts VIII and XI: Title VII and Title IX Retaliation Claim against PASSHE and IUP</u>

Lastly, Defendants move to dismiss Thelen's Title VII and IX retaliation claims, arguing that Thelen has not alleged a protected activity or a casual connection.  (ECF No. 13 at 16, 18).

To state a retaliation claim, a plaintiff must allege that: (1) he engaged in protected conduct, (2) his employer took adverse action against him, and (3) a causal link exists between the protected conduct and the adverse action.  *Jennings-Fowler v. City of Scranton*, 680 Fed. App'x 112, 119 (3d Cir. 2017) (Title VII); *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017) (Title IX)).

> Protected activity includes formal charges of discrimination "as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges."  *See, e.g., Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).  However, to constitute "protected activity," the employee must also have a "good faith, reasonable belief that a violation existed."  *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996).

*Stoud v. Susquehanna Cty.*, 471 F. Supp. 3d 606, 617 (M.D. Pa. 2020) (quoting *Mufti v. Aarsand & Co., Inc.*, 667 F. Supp. 2d 535, 552 (W.D. Pa. 2009).  Reporting or questioning the adequacy of a Title IX investigation is quintessential protected activity.  *Doe*, 850 F.3d at 564; *see Meyers v. Cal. Univ. of Pa.*, 2014 WL 3890357, at *12 (W.D. Pa. July 31, 2014) ("Protected activity includes informal protests of discriminatory activities, such as making complaints to supervisors").  Thelen alleges he reported sexual harassment by a supervisor of a new female officer to Bickley.

Although Thelen has pleaded that he engaged in protected conduct, he has not plausibly alleged a causal connection.[8]  "A causal connection may be shown through 'timing,' (*i.e.*, temporal proximity between the protected activity and the adverse action), 'continuing antagonism,' or 'other evidence gleaned from the record as a whole from which causation can be inferred.'" *Goodman v. Norristown Area Sch. Dist.*, 2020 WL 5292051, at *5 (E.D. Pa. Sept. 4, 2020).  "[T]o establish the requisite causal connection, [a p]laintiff must allege facts to demonstrate either: '(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Ed.*, 97 F. Supp. 3d 657, 682 (W.D. 2015) (Title IX); *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (explaining a plaintiff can meet its burden relying on a "broad array of evidence" including an inconsistent explanation, "a pattern of antagonism," or "temporal proximity").

A review of the Amended Complaint reveals no basis for finding a causal connection. Although Thelen does not articulate the exact date of the Title IX complaint(s), it appears from a review of the complaint that he engaged in protected activity sometime between 2015 and 2018. (ECF No. 10 ¶¶ 27-34).  Thelen was not terminated until 2020, however.  (*Id.* ¶ 276).  Accordingly, his claim lacks the requisite temporal proximity.  Thus, the Court must determine whether there are other facts to suggest a retaliatory motive.  *See Blakney v. City of Phila.*, 559 Fed. App'x 183, 184 (3d Cir. 2004).

Thelen has failed to allege any facts to plausibly suggest a pattern of antagonism stemming from his Title IX complaint or an inconsistent explanation.  *See Doe v. Princeton Univ.*, 790 Fed. App'x 379, 385 (3d Cir. 2019) (finding the mere existence of a Title IX complaint does not alone

---

[8] Thelen did not respond to Defendants' causation argument.  (ECF No. 20 at 28-29).

support a claim of retaliation in a request for accommodation context).  In fact, he pleads no facts even suggesting that anyone later made reference to his protected activity or that it factored into his termination (outside of bald legal conclusions).  *Contra Mammen v. Thomas Jefferson Univ.*, 462 F. Supp. 3d 518 (E.D. Pa. May 26, 2020) (finding this element was met where defendants made a veiled statement to the plaintiff during her termination that "she was not 'happy' and would 'never be happy'").

Because Thelen has failed to state a plausible claim for retaliation under Title VII or Title IX and amendment would be futile, Counts VIII and XI will be dismissed with prejudice.

## V.     Conclusion

For these reasons, Defendants' motion will be denied as to Count I.  Plaintiff's perceived as disabled claim in Count II is dismissed without prejudice.  Counts III and V will be dismissed with prejudice except to the extent that Thelen seeks prospective injunctive relief from Defendants in their official capacities.  Counts IV, VI through XI will be dismissed with prejudice.

An appropriate order follows.

Dated: August 3, 2021

BY THE COURT:

/s/ Patricia L. Dodge
PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE

25